*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-1227**

In the Matter of the Welfare of the Child of: J. B. and R. D. S., Parents

**Filed January 17, 2017
Affirmed
Connolly, Judge**

Hennepin County District Court
File No. 27-JV-15-4880

Mary F. Moriarty, Hennepin County Public Defender, Peter W. Gorman, Assistant Public Defender, Minneapolis, Minnesota (for appellant father-R.D.S.)

Michael O. Freeman, Hennepin County Attorney, Michelle A. Hatcher, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services and Public Health Department)

Paul J. Maravigli, Assistant Hennepin County Public Defender, Minneapolis, Minnesota (for respondent mother-J.M.B.)

Mary A. Torkildson, Minneapolis, Minnesota (for respondent R.B.-S.)

Eric S. Rehm, Burnsville, Minnesota (for guardian ad litem Cheryl Wilson)

Considered and decided by Reilly, Presiding Judge; Connolly, Judge; and Bjorkman, Judge.

UNPUBLISHED OPINION

**CONNOLLY**, Judge

On appeal from the district court's termination of his parental rights, appellant-father argues that (a) the district court should not have bifurcated the trial on a single termination of parental rights (TPR) petition; (b) the record does not demonstrate that termination of his parental rights is in the child's best interests; and (c) the record does not demonstrate that father failed to satisfy the duties of the parent-child relationship, that reasonable efforts failed to correct the conditions leading to the out-of-home placement, that the child is neglected and in foster care, and that the child suffered egregious harm. Because the district court did not abuse its discretion in bifurcating the trial or deciding that termination was in the child's best interests and because clear-and-convincing evidence supports the district court's finding that appellant did not satisfy the duties of the parent-child relationship, we affirm.

## FACTS

Appellant-father Ricardo Dante Snarski fathered a child, R.B.-S.,[1] born in August 2004, with respondent-mother J.M.B. The couple was not married when the child was conceived or when the child was born and J.M.B. was the sole custodian.

J.M.B., mother to R.B.-S. and seven other children with three different fathers, has had numerous contacts with child protection for issues including physical abuse, sexual abuse, exposure of her children to domestic violence, and inadequate supervision. In 2010,

---

[1] The district court refers to the child as "Child 1." Because our preference is to use the child's actual initials, we do so here.

R.B.-S. was in an out-of-home placement for almost 11 months. On December 13, 2013, a petition was filed alleging that R.B.-S. and seven of her siblings were in need of protection or services. On January 30, 2014, R.B.-S. was adjudicated in need of protection or services but allowed to remain in the care of her mother under conditions of protective supervision. On September 24, 2014, R.B.-S. was removed from J.M.B.'s care and placed in foster care. On October 2, 2014, legal custody of R.B.-S. was transferred to the Hennepin County Human Services and Public Health Department. On August 27, 2015, approximately 11 months after being placed in foster care, R.B.-S. was returned to the care of J.M.B. under a trial home visit with five of her siblings. That visit ended approximately three months later on December 2, 2015 after a domestic incident occurred in the home with the children present. Permanency review hearings were held and continued foster care placement was ordered on March 5, 2015, August 5, 2015, and September 15, 2015. Appellant made his first physical appearance and was appointed a public defender on January 4, 2016. At that hearing, the district court bifurcated the trial, separating J.M.B.'s trial from appellant's and another father's. J.M.B.'s trial went forward on January 14, 2016 and her parental rights to R.B.-S. and her seven other children were terminated on March 22, 2016 by order of the district court.

A child-protection social worker (the social worker) was assigned to work with the family in November 2013. She testified that she did not have any contact with appellant during the period that R.B.-S. was in the care of her mother under conditions of protective supervision or when R.B.-S. was removed from her mother's care in September 2014. Appellant's whereabouts remained unknown until December 2014 when the social worker

3

received a call from a correctional facility in Wisconsin indicating that appellant had been incarcerated since August 2014, would be released soon, and wanted contact with R.B.-S. Appellant was released from custody on February 17, 2015 but was reincarcerated on March 3, 2015 because of a probation violation. He did not establish contact with the social worker during the time he was out of custody. He participated in an admit/deny permanency hearing over the phone while in custody on September 15, 2015–his first participation in court regarding the TPR.

Appellant was released from custody again in December 2015. Prior to his release, he again informed the court of his upcoming release and desire to care for R.B.-S. He requested more time to show he could care for R.B.-S. and indicated that, upon release, he would do everything required of him in order to take custody of R.B.-S.

While in prison, appellant was offered a case plan by the social worker that included establishing and maintaining contact with the social worker, maintaining contact with R.B.-S., completing a mental-health evaluation and following all recommendations, engaging in parenting education, submitting to random urinalysis, finding employment, finding safe and suitable housing, remaining law abiding, and following conditions of the criminal court and probation. Upon his release in December 2015, appellant met with the case worker to specifically go over the case-plan expectations and what was required in order to comply with the case plan.

In February 2016, appellant was again arrested on a probation violation in Milwaukee. He was still incarcerated on the date of his TPR trial. The social worker testified that appellant violated the terms of his probation by breaking into a car to steal

4

lottery tickets. She testified that appellant's probation officer reported that he could receive two and a half years in prison. On cross-examination the social worker admitted that "[she] heard [appellant is going to be in custody for] two and a half years, but he might be out in 30 days," indicating she was not certain as to the length of his incarceration.

The district court found that "[o]verall, [appellant's] case plan compliance has been minimal." Specifically, the court found that appellant's status in and out of custody throughout the case was a major barrier to his progress, that it was hard to maintain contact with R.B.-S. or the social worker while incarcerated, and that appellant's ability to engage in case-plan tasks was limited during incarceration. The social worker stressed the importance of remaining law abiding to appellant during their interactions and, at the time, appellant acknowledged that he understood and appeared to be sincere.

The district court did find that, during the limited time appellant was out of custody, he made progress on the case plan. He provided urinalysis through probation that were reportedly negative, he was staying in a shelter after having jeopardized his mother's senior housing by staying with her, he was in contact with R.B.-S.'s therapist and her teacher, and there was discussion of starting family therapy a couple times a month that he could have participated in by phone or in person depending on his circumstances. He was scheduled to undergo a psychological-health evaluation in February 2016 but his arrest prevents him from complying with this task until he is released from custody again. Appellant did the programming he could while in custody, which included a drug-treatment and parenting program. He is currently enrolled in a "Healthy Relationships" program. Appellant has maintained what contact he can with R.B.-S. by sending cards and gifts and maintaining

5

some phone contact with the child. While appellant was in the community he was offered supervised visitation with the child which the department facilitated by providing transportation and lodging assistance. The social worker described the visits as productive but also testified "credibly and persuasively" that it was not in the child's best interests to facilitate visitation during the periods that appellant was incarcerated.

The social worker also credibly testified that R.B.-S. was disappointed when appellant did not follow through on his plans to do well, get a job, and attend school. Further, the social worker testified that R.B.-S. "shut down" after appellant returned to custody and has struggled. R.B.-S. has been diagnosed with Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, Attention Deficit/Hyperactivity Disorder–Combined Type, Major Depressive Disorder–Single Episode–Moderate, Oppositional Defiant Disorder or Anxiety Disorder, and a personal history of neglect. She has exhibited physically aggressive behaviors and has destroyed property while in foster care. She receives therapy and Children's Therapeutic Services and Supports (CTSS) skills therapy to address her depression, stress, and separation from her family. She is not able to be placed in the same foster home as her siblings because of the negative behaviors they exhibit when they are together.

On June 28, 2016, the district court terminated appellant's parental rights, concluding that there was clear-and-convincing evidence that appellant's parental rights should be terminated because: (1) he had substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon him by the parent and child relationship; (2) following the child's placement out of the home, reasonable efforts, under

6

the direction of the court, failed to correct the conditions leading to the placement; (3) a child experienced egregious harm in the parent's care that is of a nature, duration, or chronicity that indicate a lack of regard for the child's well-being, such that a reasonable person would believe it contrary to the best interests of that child or any child to be in the parent's care; (4) the child had been neglected and in foster care; and (5) it was in the child's best interest.

Appellant filed a motion for a new trial arguing that the district court erred in bifurcating the TPR proceedings over the objection of appellant's counsel; the court ignored testimony regarding the significant bond between appellant and his daughter as well as the support he gave her while he was incarcerated; and the court ignored testimony regarding the services appellant had sought out for himself in order to satisfy case-plan requirements. The district court denied his motion for a new trial.

## D E C I S I O N

**I.**      **Did the district court abuse its discretion in bifurcating the trial on a single TPR petition?**

Appellant argues that the district court abused its discretion by bifurcating the single petition for the TPR into two trials. Whether to bifurcate a proceeding to terminate parental rights is discretionary with the district court. *See In re Welfare of Children of J.B.*, 698 N.W.2d 160, 171 (Minn. App. 2005) (ruling that "the district court did not abuse its discretion by bifurcating mother's proceeding from father's proceeding and allowing mother's proceeding to proceed in a timely fashion."). The juvenile protection rules do not specifically address bifurcation but, under the civil rules, a motion for a bifurcated trial is

appropriate when it furthers convenience, avoids prejudice, or when separate trials would be conducive to expedition and economy. Minn. R. Civ. P. 42.02. We recognize that generally the rules of civil procedure do not apply to juvenile protection matters. Minn. R. Juv. Prot. P. 3.01. However, in this unique case, we conclude that the standard for determining if bifurcation is appropriate in the civil context is helpful.

At a pretrial conference on December 17, 2015, a trial date was set for J.M.B. for mid-January on the TPR petition. On January 4, 2016 a continued pretrial conference was held. Appellant's attorney was not able to be present at the hearing until it had already begun and had not had any previous contact with appellant. At that hearing, the district court decided to "trifurcate the proceedings." At that time it decided to move forward for trial with respect to mother-J.M.B. which was set for January 14, 2016. The court decided to separate the trials of two of the fathers of the children, appellant and father-K.E. The court explained its decision in its TPR order stating:

> [Appellant] had previously appeared [September 15, 2015] in the proceeding and it was not possible for him to have counsel appointed for him until he was physically present. At that date, the termination of parental rights trial had been scheduled for [J.M.B.] and other fathers on the case for months. It was entirely a result of [appellant's] choices made during the case that he did not appear personally prior to January 4, 2016. . . . [A] continuance of [J.M.B.'s] trial was not necessary in order to protect [appellant's] trial rights and it would have further delayed permanency for [R.B.-S.] and her siblings. Bifurcation allowed [J.M.B.'s] trial to proceed in a timely manner and resulted in quicker permanency for seven of her children. The Court was also able to more promptly schedule and complete [appellant's] trial by eliminating calendar concerns for the attorneys representing the other parents on the case. And claims of prejudice by [appellant's] counsel are without merit because the scope of [J.M.B.'s] trial was limited

8

> to her issues and the needs of her children, and did not address [appellant's] ability to parent [R.B.-S.]

We conclude that the district court did not abuse its discretion in bifurcating the trial. R.B.-S. had been in out-of-home placement since September 24, 2014 except for three months in the fall of 2015. During that time, appellant was released from jail and then reincarcerated because of a probation violation, twice.

J.M.B.'s trial was two weeks away when appellant was physically able to attend a hearing and thus be appointed public defense counsel.[2] Having just obtained counsel, it would have prejudiced appellant greatly to proceed with his trial ten days later. The court made a decision in the interest of judicial economy and the interest of the children, who were in need of a permanency determination. Had appellant remained law abiding, he likely would have had counsel that would have been prepared for trial on the date set for J.M.B. In addition, while appellant has pointed to facts in J.M.B.'s case that involved appellant, specifically R.B.-S.'s multiple mental-health diagnoses, he has not indicated why those facts were objectionable or how he was prejudiced thereby. No objection was raised when the social worker testified to R.B.-S.'s multiple diagnoses at appellant's own trial. As a result, we conclude that the district court did not abuse its discretion in bifurcating the trials.

---

[2] It is the policy of the Hennepin County Public Defender's office not to appoint counsel until the parent is physically present at court.

9

**II.    Did the trial court abuse its discretion in concluding that the TPR would be in the child's best interests?**

"We review a district court's ultimate determination that termination is in a child's best interest for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 905 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012). "[D]etermination of a child's best interests is generally not susceptible to an appellate court's global review of a record, and . . . an appellate court's combing through the record to determine best interests is inappropriate because it involves credibility determinations." *In re Welfare of the Child of D.L.D.*, 771 N.W.2d 538, 546 (Minn. App. 2009) (quotations omitted). Even when statutory grounds for termination are met, the district court must separately find that termination is in the child's best interests. Minn. Stat. § 260C.301, subd. 7 (2016); *In re Tanghe*, 672 N.W.2d 623, 625-26 (Minn. App. 2003). It must consider the interests of both the parent and the child in preserving their relationship as well as any competing interests of the child. *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992).

Appellant argues that it is clear that appellant loves his daughter. But "a parent's love and desire to regain custody may not be enough." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 92 (Minn. App. 2012). Appellant also argues that "[n]o child's best interests are served by permanent separation from each other (which is likely to happen with eight children), from relatives willing to care for them, and from a father who completed virtually all of his case plan." However, the record contradicts these arguments.

The child services worker credibly testified that R.B.-S. has been in foster care since September 2014, she needs permanency, she needs a consistent and predictable

10

environment, and she needs someone who is going to be there to meet her needs. Evidence in the record indicates that it is in the siblings' best interests to be separated from each other. There have been reports that when R.B.-S. and the other three oldest siblings were placed together they appeared to encourage negative behavior amongst one another, destroyed portions of a foster house causing thousands of dollars' worth of damage, assaulted staff and peers, were unsafe to transport, were defiant, and impeded daily routine. The social worker testified that when the children are together they plan things, either to attack the foster parent or to run, and it would make it very unsafe for the foster parent in that environment. This supports the district court's finding that "[R.B.-S.] is not able to be placed in the same foster home as her siblings because of the negative behaviors they exhibit when they are together."

The social worker also testified that the department explored placement with a number of family members in Milwaukee and would continue to prioritize family members for adoption, if they were to come forward. However, the social worker testified to the difficulty in placing a child in an out-of-state home and there are no willing relatives in Minnesota.

Appellant also argues that he "completed virtually all of his case plan." We disagree. Appellant's case plan required him to: (1) establish and maintain contact with the child-protection social worker; (2) maintain contact with R.B.-S.; (3) complete a mental-health assessment; (4) engage in parenting education and evaluation; (5) submit to random urinalysis testing or complete a chemical-health assessment; (6) find safe and suitable housing; (7) obtain employment; (8) remain law abiding; and (9) comply with

conditions of criminal probation. Appellant established and maintained contact with a child-protection social worker as best as he could while incarcerated; he engaged in parenting education; and he submitted to random urine testing while not incarcerated. He has also attempted to maintain consistent contact with R.B.-S. with letters and calls when incarcerated and visits when he was not incarcerated.

However, appellant failed to remain law abiding, violating his probation in March 2015 and, most recently, in February 2016 by stealing lottery tickets from a car. Additionally, the child-services worker testified that he had not found stable housing. He had originally been staying with his mother but had to move to a shelter when he threatened his mother's housing situation. While appellant was able to find employment, it is not clear to us how he is able to maintain that employment while he is incarcerated. His probation violations and incarcerations also prohibited him from obtaining a psychological evaluation.

Further, there is a major difference between actually satisfying the needs of a child with the history and medical diagnoses that R.B.-S. possesses and merely sending letters and gifts and making phone calls. Appellant has failed to show that he has the ability to care for the daily needs of his child because his contact with the child has been limited due to his incarceration.

Because appellant failed to follow the conditions of his case plan in multiple ways by: not remaining law abiding, not obtaining safe and suitable housing, not completing a psychological evaluation because he was unable to remain law abiding long enough to schedule and complete an evaluation, and because there are questions regarding his ability

12

to find and maintain employment, we conclude that there is substantial evidence in the record supporting the district court's conclusion that appellant did not substantially comply with his case plan.

Evidence in the record supports R.B.-S.'s need for permanency and stability and appellant, despite having over two years to show he can provide for R.B.-S., has failed to show that he can provide the permanency and stability necessary. We conclude that the district court did not abuse its discretion in finding that TPR is in the child's best interest.

**III.    Is there clear-and-convincing evidence that the father failed to satisfy the duties of the parent-child relationship, reasonable efforts failed to correct the conditions leading to the out-of-home placement, the child is neglected in foster care, and the child suffered egregious harm?**

There is a "presumption that a natural parent is a fit and suitable person to be entrusted with the care of his or her child." *In re Welfare of A.D.*, 535 N.W.2d 643, 647 (Minn. 1995). "Ordinarily, it is in the best interest of a child to be in the custody of his or her natural parents." *Id.* Therefore, "[p]arental rights are terminated only for grave and weighty reasons." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990). In a proceeding to terminate parental rights, the county "bears the burden of producing clear and convincing evidence that one or more of the statutory termination grounds exists." *In re Welfare of C.K.*, 426 N.W.2d 842, 847 (Minn. 1988). We will affirm the district court's decision to terminate parental rights if at least one statutory ground for termination is supported by clear-and-convincing evidence, termination is in the best interest of the child,

13

and the county has made reasonable efforts to reunite the family. *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396-97 (Minn. 1996).[3]

On appeal, this court determines "whether the district court's findings address the statutory criteria and whether those findings are supported by substantial evidence and are not clearly erroneous." *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 249 (Minn. App. 2003) (quotation omitted). We defer to a district court's credibility determinations because the "district court is in a superior position" to make judgments regarding credibility of witnesses. *In re L.A.F.*, 544 N.W.2d at 396. A district court's decision regarding a termination must be "based on evidence concerning the conditions that exist at the time of termination." *In re Welfare of Child of T.D.*, 731 N.W.2d 548, 554 (Minn. App. 2007) (quotation omitted). Appellant argues that there is not clear-and-convincing evidence in support of TPR under Minn. Stat. § 260C.301, subd. 1(b)(2), (5), (6), or (8) (2016).

**A.  Minn. Stat. § 260C.301, subd. 1(b)(2)**

A juvenile court may terminate all rights of a parent to a child if it finds that

> the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with . . . shelter, education, and other care and control necessary for the child's physical, mental, or emotional health and development, if the parent is physically and financially able, and either reasonable efforts by the social services agency have failed to correct the conditions that formed the basis of the petition or reasonable efforts would be futile and therefore unreasonable.

---

[3] Appellant does not challenge the county's reasonable efforts to reunite the family on appeal.

Minn. Stat. § 260C.301, subd. 1(b)(2).

Appellant argues that the case planning was of a voluntary nature and thus the termination order based on subd. 1(b)(2), (5), and (8) must be reversed because it relies upon an alleged failure to complete voluntary case planning. Appellant relies on *In re Welfare of the Child of S.T. & T.L.D.T.*, 2011 WL 5026349, at *4 (Minn. App. Oct. 24, 2011),[4] which held that "[t]he district court erred to the extent that it based its termination of father's parental rights on his failure to follow the voluntary case plan." However, in situations where the case plan was developed with the father's input, where he signed the case plan, and where he agreed that the needed services were outlined in the case plan, this court has concluded that the district court did not err by considering the father's failure to complete the case-plan services in its decision to terminate parental rights. *In re Welfare of Child of P.J.M.*, 2015 WL 3972644, at *4 (Minn. App. June 15, 2015).

In this case, appellant wrote a letter to the district court judge while he was in prison stating that he was not informed of a case plan but he did talk to a child-protection worker. In his letter, he stated: "I [would] like the court to please allow me to complete my time so I can get out and meet all things you require of me to take custody of [R.B.-S.]." The testimony of the child-services worker indicates that appellant was aware of the case plan. The child-services worker sat down and talked with him about his case plan, he signed the case plan, and he was provided a copy of the case plan. Based on this information, the

---

[4] Unpublished opinions are of limited value in deciding an appeal. *See* Minn. Stat. § 480A.08, subd. 3(c) (2016) (stating that "[u]npublished opinions of the court of appeals are not precedential").

district court did not err in considering his failure to comply with the voluntary case plan in determining whether to terminate parental rights.

Appellant further argues that, with respect to subd. 1(b)(2), this case is not analogous to *In re Child of Simon*, 662 N.W.2d 155 (Minn. App. 2003). We disagree. "Although a parent's incarceration alone is not enough to warrant termination of parental rights, the district court may consider the fact of incarceration in conjunction with other evidence supporting the petition for termination." *Simon*, 662 N.W.2d at 162. In *Simon*, the court concluded that Simon never underwent a psychological evaluation or parenting assessment, and that Simon "failed to provide any meaningful parenting to T.H." and "offered no evidence that he possesse[d] skills and knowledge to parent T.H. effectively." *Id.* at 163 (quotations omitted). While the facts are not identical, the district court came to a similar conclusion in this case. It concluded that appellant exhibited clear and consistent patterns during the case that prevent him from parenting the child in the foreseeable future. Appellant was aware of the issues with J.M.B.'s care of the children, was given an opportunity to show that he could be the primary caregiver, and instead was returned to prison on two different occasions for failure to remain law abiding.

*In re Welfare of Barron*, 268 Minn. 48, 127 N.W.2d 702 (1964), cited by appellant, is not analogous because it did not involve a parent who refuses to remain law abiding despite being given several opportunities to do so. *In re Welfare of Statt*, 287 Minn. 501, 505, 178 N.W.2d 709, 712-13 (1970) concluded that "imprisonment per se is not sufficient to constitute abandonment." In this case, abandonment is not an issue. In *In re Welfare of L.L.N.*, 372 N.W.2d 60, 62 (Minn. App. 1985), cited by appellant, while the court

16

concluded that "[i]nfrequent visitation and sporadic child support payments are insufficient reasons to terminate parental rights," the appellant was not arrested repeatedly, did not fail to obtain safe and suitable housing, and did not fail to obtain a psychological assessment because he could not remain law abiding for more than two months.

The district court's conclusion that appellant failed to complete his case plan is not erroneous nor is it contradicted by the record, as appellant alleges. Appellant's successes are often followed by statements like "he had difficulty continuing with this when he returned to custody." Appellant has repeatedly shown himself unable to stay out of custody. The medical diagnoses of R.B.-S. indicates that she needs permanency and reliability that appellant has not shown that he can provide. When he was first released, he stayed out of jail for one month before violating probation. During this time, he did not contact the social worker to spend time with R.B.-S. Then, after he was released again, he stayed out of incarceration for two months before stealing lottery tickets from a car and being sent back to prison. This is clear-and-convincing evidence that appellant has continuously and repeatedly refused to comply with the duties imposed upon him by the parent and child relationship. He cannot provide for R.B.-S. while in prison. He cannot provide her with shelter, food, medical necessities, supervision, or support.

We conclude that there is clear-and-convincing evidence and that the district court did not err in concluding that appellant has substantially, continuously, and repeatedly refused or neglected to comply with the duties imposed upon him by the parent and child relationship. Because we affirm a TPR if even one statutory ground for termination is

17

supported by clear-and-convincing evidence, we need not reach the other statutory grounds

for termination in this case. *See In re L.A.F.*, 554 N.W.2d 396-97.

**Affirmed.**